The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

William Theodore John MILNE, Defendant-Appellant.

No. 83SA451.

Supreme Court of Colorado, En Banc.

Nov. 5, 1984.

Rehearing Denied Nov. 26, 1984.

---

L. Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Valerie J. Petersen, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Elvin L. Gentry, Colorado Springs, for defendant-appellant.

ERICKSON, Chief Justice.

The defendant, William Milne, appeals his conviction for selling securities without a license. Section 11–51–104(1), 4 C.R.S. (1973).[1] He claims that he cannot be convicted under the statute for the following reasons: (1) the notes he sold are not securities; (2) his acquittal on the charge of failure to register securities is inconsistent with his conviction for failing to obtain a license to sell securities; and (3) parts of the Colorado Securities Act are unconstitutionally vague and overbroad. He also asserts that the imposition of restitution as a condition of probation for his conviction on the charge of failing to obtain a license is improper. We affirm.

I.

In 1963, the defendant acquired an interest in and became president of the Valley Loan Association (VLA), a small corporation in Lamar, Colorado, engaged primarily in the business of extending consumer finance loans. During his initial association with VLA he restricted his activities largely to insurance, but in later years he became more directly involved in the corporation's financing and consumer loans. He acquired complete ownership of VLA in 1968.

Prior to and throughout the defendant's association with VLA, the corporation issued "investment notes" to various purchasers. The notes ranged in amount from $2,000 to $8,000 and originally paid interest quarterly at rates ranging from seven and one-half to ten percent per annum.[2] The notes stated a five-year maturity date and contained a provision that they could become due and payable at the option of the holder upon sixty days written notice. Money obtained from the notes was used to finance consumer purchase money loans and, during a period when VLA was experiencing financial difficulties, to meet interest payments on outstanding notes.

In late 1979 and early 1980, VLA experienced serious financial difficulties and was unable to satisfy the demands made for repayment of the principal due on outstanding notes. The defendant attempted to meet the corporation's payment obligations by mailing corporate checks to the noteholders, but the checks were later returned unpaid. The defendant declared bankruptcy in 1981, and his personal liability to the holders of the notes was ultimately discharged in the United States Bankruptcy Court.

1. The defendant was charged and tried under the Colorado Securities Act as it stood prior to the adoption of the 1981 amendments. His appeal was transferred to this court because of the constitutional claims raised by him. *See* §§ 13–4–102(1) & 13–4–110(1)(a), 6 C.R.S. (1973).

2. The interest rate was increased to as much as 16.5% on some of the notes. The noteholders were notified of the increases by letters signed by the defendant, all of which contained the sentence, "should you have friends with funds who are interested in this favorable return, we are continuing to issue investment notes, for a limited period."

As a result of complaints made by unpaid noteholders to the El Paso County district attorney, a criminal information was filed against the defendant on March 19, 1982, charging him with failing to register securities, § 11–51–106, 4 C.R.S. (1973), selling securities without obtaining a license, § 11–51–104, 4 C.R.S. (1973), violations of the Colorado Savings and Loan Act,[3] §§ 11–41–103 & 127, 4 C.R.S. (1973), and twelve counts of fraud by check, §§ 18–5–205(2) & (3)(d), 8 C.R.S. (1978). The case was tried before a jury, and a verdict of guilty was returned only on the licensing charge. The defendant's motion for judgment *non obstante veredicto*, judgment of acquittal, or new trial was denied by the district court, and he was sentenced to five years of probation. As a condition of probation, the district court ordered the defendant to pay restitution to the unpaid noteholders.

## II.

The defendant claims that he cannot be convicted under Colorado's Securities Act because the notes issued by VLA are not securities. We do not agree.

■ While this court is not bound by federal law in the interpretation of the Colorado Securities Act, we have held that federal authorities that interpret provisions parallel to the Colorado act are highly persuasive. *Lowery v. Ford Hill Investment Company*, 192 Colo. 125, 556 P.2d 1201 (1976); *Raymond Lee Organization v. Division of Securities*, 192 Colo. 112, 556 P.2d 1209 (1976). Colorado's statutory definition of the term "security" includes "any note … evidence of indebtedness … participation in any profit sharing agreement … investment contract … or, in general, any interest or instrument commonly known as a security …." § 11–51–102(12), 4 C.R.S. (1973). The definition is virtually identical to the definition of "security" in the federal securities act. *See* 15 U.S.C. § 77b(1) (1982). As we stated in *Lowery*, the broad scope of the statutory definition evinces "a legislative intent to

provide the flexibility needed to regulate the various schemes devised by those who seek to use the money of others with the lure of profits." 192 Colo. at 130, 556 P.2d at 1205.

We cannot agree that the "investment notes" issued by VLA are not securities. As "notes," they fall squarely within the language of section 11–51–102(12). Furthermore, the instruments meet the interpretative test which was developed in *SEC v. W.J. Howey Company*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) and adopted by this court in *Lowery*, 192 Colo. at 130, 556 P.2d at 1205. *See SEC v. World Radio Mission, Inc.*, 544 F.2d 535 (1st Cir.1976) (interest bearing notes payable in seven years with 90 day acceleration clause and increases in interest rate are securities under a literal reading of the federal securities act and the interpretive test).

■ The touchstone of a security is the presence of an investment in a common enterprise that is premised on a reasonable expectation of profits to be derived from the entreprenurial or managerial efforts of others. *United Housing Foundation v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975); *Howey*, 328 U.S. at 298–99, 66 S.Ct. at 1102–03; *Lowery*, 192 Colo. at 130, 556 P.2d at 1205. Here, each of the noteholders entrusted money with the defendant in return for "investment notes," with the expectation of receiving periodic interest payments in addition to repayment of the principal amount. The interest rates were raised periodically to induce the holders to retain the notes, to encourage further purchases, and to attract additional purchasers who were "interested in [the] favorable return" the notes provided. The holders invested with the primary purpose of receiving profits.

The holders also invested in a "common enterprise" insofar as the return on their money paid to VLA was dependent upon the continuing operation and success of the

3. The charge relating to violations of the Savings and Loan Act was dismissed prior to trial.

business. Should the corporation become insolvent or sustain substantial financial losses, as was actually the case, the source of the fund from which payment was to be made would be lost. *See, e.g.,* H. Bloomenthal, *Securities Law Handbook,* (1983) at 22. Moreover, the investors' expectation of profit derived solely from the managerial efforts of others. Payment of the promised return depended solely upon the ability of the defendant and other VLA officials to successfully manage and operate the corporation. The investors had no ability to control or manage the funds they invested or otherwise ensure that their promised return was actually paid.

 We therefore conclude that the VLA "investment notes" are securities within the meaning of the Colorado Securities Act.[4]

### III.

The defendant claims that the obligation to obtain a license to sell securities does not apply to persons dealing in exempt securities or exempt transactions. He claims that his acquittal on the charge of failure to register securities constitutes a finding that either the securities he sold or the transactions underlying his sales were exempt, and that such a finding is inconsistent with his conviction for failing to obtain a securities license. He also argues that the application of the licensing requirement of section 11–51–104 to persons transacting business in exempt securities or transactions would render the licensing

requirement unconstitutionally vague and overbroad. We reject both of the defendant's assertions.

### A.

The licensing provision of Colorado's Securities Act does not allow "any person to transact business in this state as a broker-dealer, issuer-dealer, or salesman unless he is licensed under this article." § 11–51–104(1), 4 C.R.S. (1973). A broker-dealer is "any person engaged in the business of effecting transactions in *securities* for the account of others or for his own account." § 11–51–102(1), 4 C.R.S. (1973) (emphasis supplied). A salesman is defined in section 11–51–102(9), 4 C.R.S. (1973), as "any individual, other than a broker-dealer or issuer-dealer, who represents a broker-dealer or issuer-dealer in effecting or attempting to effect purchases or sales of *securities*" (emphasis supplied).

 The statutory scheme of the Securities Act supports the requirement of obtaining a license even if the securities or the transactions are exempt. The licensing provision of section 11–51–104 is not contingent upon dealers or salesmen engaging in the sale of *registered* securities, but rather applies to *any* person acting as a dealer or salesman. The statute also fails to provide an exemption from licensing for persons dealing in exempt securities or transactions in any of the definitional provisions.[5] Moreover, while the statute expressly exempts specified securities and transactions from the registration requirement of sec-

---

4. Our conclusion that the VLA investment notes are securities dispenses with the defendant's assertion that they constitute exempt "commercial paper." The instruments here do not arise "out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which evidences an obligation to pay within nine months of the date of issuance...." § 11–51–114(1)(i), 4 C.R.S. (1973).

5. The statutory definition of "salesman" was amended in 1977 to delete the following sentence:

"Salesman" does not include an individual who represents an issuer in effecting transactions in a security exempted by section 11–51–114(1)(a), (1)(b), (1)(c), (1)(i), (1)(j), or (1)(k),

in effecting transactions exempted by section 11–51–114(2), or in effecting transactions with existing employees, partners, or directors of the issuer if no commission or other renumeration is paid or given directly or indirectly for soliciting any person in this state.

Ch. 126, sec. 1, § 11–51–102(9), 1977 Colo.Sess. Laws 578. The deletion of the provision excluding persons representing an issuer who deal in exempt securities or transactions from the definition of "salesman" is further evidence of the general applicability of the licensing provision to all persons regularly involved in securities transactions, regardless of the exempt status of the security or transaction.

tion 11–51–106 and from the requirement to file sales literature under section 11–51–115, it does not provide a similar exemption from the licensing provision of section 11–51–104. *See* §§ 11–51–114(1) & (2), 4 C.R.S. (1973).

■ The statutory framework enacted by the General Assembly requiring dealers and salesmen of securities to obtain a license, even if the securities or underlying transactions are exempt, is not irrational. We have held that commercial and business activities are subject to reasonable regulation by the state in the exercise of its regulatory power to preserve and enhance the public health, safety, and welfare. *Colorado Auto and Truck Wreckers Association v. Department of Revenue,* 618 P.2d 646, 654 (Colo.1980).

■ A purpose of the licensing requirement under the Securities Act is to protect the public from the financial insecurity and fraudulent activities of persons regularly engaged in the sale of securities. *See* § 11–51–105, 4 C.R.S. (1973); *H.L. Shaffer and Company v. Prosser,* 99 Colo. 335, 62 P.2d 1161 (1936). The purpose is similar to the purpose underlying the registration and disclosure provisions of the act. *See Lowery,* 192 Colo. at 133, 556 P.2d at 1207. The fact that the public protection purpose of the registration requirement may not be implicated in certain exempt transactions or securities, however, does not preclude the state from requiring that persons dealing regularly in the sales of securities be previously approved by the state as being sufficiently competent, experienced, and financially secure, prior to their being allowed to deal with the public and commence any sales at all. The licensing requirement may be viewed essentially as a means to regulate the qualifications of the person transacting business, rather than the nature of any specific transaction or security.

In addition, the requirements involved in obtaining a license, such as filing a consent to service of process, supplying information with respect to the applicant's form and place of organization, and the statutory bonding provisions, provide means of overseeing and regulating the general business affairs of dealers and salesmen that are independent of the more "transaction specific" registration and disclosure provisions. *See* § 11–51–105, 4 C.R.S. (1973).

■ We conclude, therefore, that the licensing requirement of section 11–51–104 legitimately applies to all dealers and salesmen, regardless of the registration status of the security or transaction.

### B.

The defendant asserts that construing the licensing provisions of section 11–51–104 to apply to persons who deal in exempt transactions or securities would render that provision unconstitutionally vague and overbroad. We do not address the merits of the defendant's claim, because he has no standing to raise a constitutional challenge to the statute.

■ Although standing to challenge a statute on the grounds of overbreadth is occasionally permitted even when the party before the court can show no chilling effect upon his own speech, such third party standing is limited to exceptional cases. *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Marco Lounge, Inc. v. City of Federal Heights,* 625 P.2d 982 (Colo.1981). When a criminal statute affects conduct rather than pure speech, we are reluctant to grant third party standing, particularly when the asserted overbreadth of the statute cannot be shown to be substantial. *Id.*

■ Here, section 11–51–104 regulates criminal conduct, and has no apparent effect upon speech or expression. The defendant has not shown that the statute has the potential to chill either his own or anyone else's expression. The asserted overbreadth of this statute has not been shown to be "substantial ... in relation to [its] plainly legitimate sweep." *Broadrick,* 413 U.S. at 615, 93 S.Ct. at 2917.

■ The defendant also lacks standing to pursue his claim of unconstitutional

vagueness. In order to assert a claim of facial vagueness in a case not implicating First Amendment rights, the defendant must show that the statute under attack is impermissibly vague in all of its applications. "[One] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman Estates v. Flipside*, 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1981); *see also City of Englewood v. Hammes*, 671 P.2d 947, 951 (Colo.1983). Here, the defendant asserts only that the law may be vague in certain hypothetical cases tied to the "commercial paper" exemption of section 11–51–114. Any assertion that it is vague as applied to him would be frivolous in light of our analysis in Part II, *supra*, demonstrating that his activities fall squarely within the purview of sections 11–51–104 and 11–51–102 as those and similar statutes have been judicially interpreted.

For these reasons, the defendant is precluded from attacking section 11–51–104 on the grounds that it is vague or that it may conceivably be applied to other persons, such as issuers of ordinary checks or promissory notes, who are not presently before this court. *People v. Enea*, 665 P.2d 1026 (Colo.1983).

### IV.

As a condition of probation, the district court ordered the defendant to pay restitution to the unpaid noteholders. On appeal, the defendant claims that the imposition of restitution for violations of "non-fraud" provisions of the Securities Act, such as the licensing provision of section 11–51–104, is improper. He asserts that the crime of selling securities without a license is a "victimless" offense for which an order of restitution is inappropriate. We disagree.

Colorado's statute governing probation states in pertinent part:

[A]s a condition of every sentence to probation, the court shall provide that the defendant make restitution to the victim of his conduct for the actual dam-

ages which were sustained .... The amount of such restitution shall be based on the actual pecuniary damages sustained by the victim....

Section 16–11–204.5, 8 C.R.S. (1983 Supp.). Restitution as a condition of probation is designed to take the profit out of crime and, to the extent practicable, to make the victims of criminal offenses whole. *Cumhuriyet v. People*, 200 Colo. 466, 469, 615 P.2d 724, 726 (1980); *People v. King*, 648 P.2d 173, 175 (Colo.App.1982). As we recently observed in *People v. Deadmond*, 683 P.2d 763, 774 (Colo.1984):

The language of Colorado's statute is unambiguous. *Payment of restitution is authorized only as to the victim of a defendant's conduct*, and only for the actual pecuniary damage the victim sustained as the direct result of the defendant's conduct. The language unequivocally states a legislative intent to authorize restitution payments only to the direct victims of criminal conduct—the person or entity whose injuries resulted from the conduct alleged as the basis for criminal proceedings against the defendant. (Emphasis added.)

We stated in part III, *supra*, that a purpose of section 11–51–104 is to protect the public from persons who regularly deal in securities transactions. As part of the statutory licensing procedure, the securities commissioner may require information relating to the applicant's business history, financial condition and history, proposed method of doing business, and other matters relating to the character and qualifications of the applicant. § 11–51–105(1), 4 C.R.S. (1973). The failure to obtain a license in accordance with the statute and the rules enacted by the securities commissioner deprives the public of the minimum level of protection required by the General Assembly for those who sell securities.

The element of sale in section 11–51–104 is as essential to a conviction as the failure to obtain a license. In this case, it was the defendant's unlicensed sales that caused persons to part with and lose con-

siderable sums of money. As part of defendant's unregulated business activity, he allowed loans to be refinanced without additional collateral. He also applied the proceeds from the sale of recently issued notes to meet payment obligations on other outstanding notes, in a characteristic "Ponzi" financing scheme. *See Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *Rosenberg v. Collins*, 624 F.2d 659 (5th Cir.1980). As the result of defendant's conduct, the investors suffered "actual, pecuniary damage" within the meaning of section 16–11–204.5. As such, the investors were as much the "victims" of the defendant's crime as would be persons who submit to harmful and unnecessary surgery at the hands of one who practices medicine without a license. The imposition of restitution is therefore appropriate following a conviction for selling securities without a license.

▮▮▮▮ The fact that the defendant's personal liability on the investment notes was discharged in the United States Bankruptcy Court does not preclude restitution. Probation is a criminal sentence, and its basic purpose is to provide a defendant with an opportunity for rehabilitation without confinement. *People v. Ressin*, 620 P.2d 717 (Colo.1981); *People v. Ledford*, 173 Colo. 194, 477 P.2d 374 (1970). An order requiring the payment of restitution as a condition of probation is as much a part of a criminal sentence as a fine or other penalty. Restitution does not create a debt or a debtor-creditor relationship between the defendant and the victim, and it is not intended as a substitute for a civil action for damages. *People v. Mosesson*, 78 Misc.2d 217, 356 N.Y.S.2d 483 (Sup.Ct. 1974).

▮▮▮▮ The bankruptcy laws, in contrast, are designed to provide financial relief to overly extended debtors. *Matter of Cox*, 33 B.R. 657 (Bankr.M.D.Ga.1983). The effect of a discharge in bankruptcy is to insulate a debtor from liability on any civil claim for payment arising out of the discharged debt. *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). Inasmuch as the bankruptcy laws are not intended to relieve a defendant from the legal consequences of a criminal conviction, monetary penalties imposed for the violation of criminal laws, other than certain tax penalties, are not dischargeable in bankruptcy. 3 *Collier on Bankruptcy*, § 523.17 (15th ed. 1984).

The validity of an order of restitution following a discharge in bankruptcy was addressed by the Fifth Circuit Court of Appeals in *United States v. Carson*, 669 F.2d 216 (1982). In that case, the defendant was convicted of making a false statement to a bank for the purpose of influencing the bank's action on a loan in violation of 18 U.S.C. § 1014 (1976). The defendant was placed on probation for five years on the condition that he make restitution to the bank for the loss resulting from the defendant's criminal acts. In a previous action, the unpaid debt which the defendant acquired from the loan was discharged in bankruptcy with no objection from the bank. In rejecting the defendant's appeal of the order of restitution, the Fifth Circuit stated that "neither [the bank's] failure to protect its rights in Carson's bankruptcy proceeding nor the consequent discharge of Carson's debt to the bank barred the district court from conditioning Carson's probation on restitution as it did." 669 F.2d at 218. The holding in *Carson* is in accord with other decisions addressing the effect of a discharge in bankruptcy on monetary criminal penalties. *See, e.g., In re Moore*, 111 Fed. 145 (W.D.Ky.1901) (fine imposed for a criminal conviction is not provable in a bankruptcy proceeding); *Matter of Cox*, 33 B.R. 657 (costs of a criminal prosecution are not dischargeable in bankruptcy); *In re Johnson*, 32 B.R. 614 (Bankr.D.Colo.1983) (prior Colorado court order to pay restitution as a condition of probation to victim of fraud is not dischargeable in a subsequent Chapter 13 proceeding in bankruptcy court); *In re Button*, 8 B.R. 692 (Bankr.W. D.N.Y.1981) (order of restitution as a condition of probation for a conviction of petty larceny is not dischargeable in bankruptcy); *Mosesson*, 78 Misc.2d 217, 356 N.Y.S.2d 483

(Sup.Ct.1974) (order of restitution for theft and forgery offenses is not dischargeable in bankruptcy).

▮ We therefore conclude that the district court properly ordered the defendant to pay restitution as a condition of his probation.[6]

The defendant's conviction is affirmed.

QUINN, J., concurs in part and dissents in part.

LOHR and NEIGHBORS, JJ., join in the concurrence and dissent.

QUINN, Justice, dissenting in part:

I dissent from Part IIIB of the court's opinion, which holds that the defendant lacks standing to challenge the statutory proscription against selling securities without a license as unconstitutionally vague.

The defendant raises two constitutional challenges to the crime of selling securities without a license as proscribed by section 11–51–104, 4 C.R.S. (1973). He contends that the statute suffers from unconstitutional overbreadth and that the statutory definition of "security" is unconstitutionally vague. I agree with the majority that the defendant lacks standing to challenge the statute as unconstitutionally overbroad. "The overbreadth doctrine prevents the state from regulating conduct by encroaching on basic constitutional rights, such as speech and assembly, which may be within the sweep of the statutory prohibition." *People v. Andrews,* 632 P.2d 1012, 1016 (Colo.1981). *See Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *People v. Mason,* 642 P.2d 8 (Colo. 1982); *People v. Garcia,* 197 Colo. 550, 595 P.2d 228 (1979). The defendant in this case made no showing that his speech or other basic constitutional rights were threatened by the application of the statute to his conduct. For this reason I see no basis to accord the defendant standing to challenge the statute as unconstitutionally overbroad.

I do believe, however, that the defendant does have standing to challenge the statute as unconstitutionally vague. A person whose activity may be constitutionally regulated nevertheless may argue that the statute under which he is prosecuted is invalid on its face. *New York v. Ferber,* 458 U.S. 747 n.21, 102 S.Ct. 3348, 3360 n. 21, 73 L.Ed.2d 1113 (1982). We addressed the issue of standing to challenge a statute as unconstitutionally vague in *People in the Interest of C.M.,* 630 P.2d 593, 594 (Colo.1981), and there stated:

> Generally, one is not entitled to assail the constitutionality of a statute except as he is adversely affected by its application to him in a given case. *E.g. People v. Wimer,* 197 Colo. 191, 591 P.2d 87 (1979); *People v. Blue,* 190 Colo. 95, 544 P.2d 385 (1975). Where, however, as here, the constitutional challenge is to those very statutory terms which constitute the basis of the underlying prosecution, requisite standing exists. *See, e.g., L.D.S., Inc. v. Healy,* 197 Colo. 19, 589 P.2d 490 (1979); *People v. Vinnola,* 177 Colo. 405, 494 P.2d 826 (1972). Neither a detailed charging document nor a fully developed factual record can serve to validate a law which on its face is so vague as to violate due process of law. *E.g., Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888, 890 (1939).

Although I would accord the defendant standing to challenge the definition of a security as unconstitutionally vague, I nonetheless would reject his claim. The controlling consideration in a void-for-vagueness challenge is "whether the questioned law 'either forbids or requires the doing of an act in terms so vague that men of ordinary intelligence must necessarily

---

**6.** The result could be different if evidence demonstrated that the principal motivation of the prosecution was to obtain payment of a dischargeable debt rather than to vindicate society's interest in enforcing the criminal law. *See* *Barnette v. Evans,* 673 F.2d 1250 (11th Cir.1982); *Matter of Lare,* 24 B.R. 959 (Bankr.D.Md.1982). The defendant makes no such claim in this case nor does the record support any such inference.

guess as to its meaning and differ as to its application ....' ", *People ex rel. City of Arvada v. Nissen,* 650 P.2d 547, 550 (Colo. 1982), quoting *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The rules applicable to a void-for-vagueness challenge are well settled. A statute is presumed to be constitutional in the first instance, and the burden falls upon the party attacking the statute to establish its unconstitutionality beyond a reasonable doubt. *E.g., People v. Alexander,* 663 P.2d 1024 (Colo.1983). Also, if the challenged statute is susceptible of different constructions, one of which satisfies constitutional requirements, the constitutional construction must be adopted. *Alexander,* 663 P.2d 1024; *Nissen,* 650 P.2d 547; *People v. Smith,* 638 P.2d 1 (Colo.1981). Finally, while a statute must be sufficiently specific to give fair warning of the proscribed conduct, due process of law has never required mathematical exactitude in legislative draftsmanship. *Alexander,* 663 P.2d at 1027; *Nissen,* 650 P.2d at 550.

Section 11–51–102(12), 4 C.R.S. (1973), defines "security," as pertinent here, to include a "note," "evidence of indebtedness," and a "certificate of interest or participation in any profit-sharing agreement." The essential attribute of a security, as the majority notes, is "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Housing Foundation v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). The fact that there might be some difficulty in applying this test to certain investment transactions does not render the statute constitutionally void. "Such difficulty ... is frequently present in cases involving the application of a legislative standard to close questions of fact and, by itself, does not amount to a constitutional infirmity." *Nissen,* 650 P.2d at 552. In short, the statutory definition of a security is sufficiently specific to withstand the defendant's vagueness challenge.

I am authorized to say that Justice LOHR and Justice NEIGHBORS join in this dissent.